No. 11-1149

_____

IN THE UNITED STATES COURT OF APPEALS
FOR THE TENTH CIRCUIT

_____

GRAY PETERSON, Plaintiff-Appellant

v.

CHARLES F. GARCIA*, ET. AL., Defendants-Appellees

_____

On Appeal from the United States District Court for the District of Colorado
Honorable Walker D. Miller, Senior District Judge

_____

**BRIEF OF SECOND AMENDMENT FOUNDATION, INC., BUCKEYE FIREARMS FOUNDATION, CITIZENS' RIGHTS ACTION LEAGUE, COMMONWEALTH SECOND AMENDMENT, CONNECTICUT CITIZENS DEFENSE LEAGUE, CALGUNS FOUNDATION, INC., GUN OWNERS CIVIL RIGHTS ALLIANCE, HAWAII DEFENSE FOUNDATION, ILLINOIS CARRY, ILLINOIS STATE RIFLE ASSOCIATION, MAINE OPEN CARRY ASSOCIATION, MARYLAND SHALL ISSUE, OREGON FIREARMS EDUCATIONAL FOUNDATION, WISCONSIN CARRY, INC., SCOPE, INC., STILLWATER FIREARMS ASSOCIATION, VIRGINIA CITIZENS DEFENSE LEAGUE, INC., AND WEST VIRGINIA CITIZENS DEFENSE LEAGUE, INC. AS AMICI CURIAE IN SUPPORT OF APPELLANTS SEEKING REVERSAL**

_____

Mikolaj T. Tempski
SECOND AMENDMENT FOUNDATION, INC.
12500 NE Tenth Pl
Bellevue, WA 98005
425.454.7012/Fax: 425.451.3959
miko.tempski@saf.org

June 13, 2011                    Counsel for *Amici Curiae*

*Appellants substituted Charles F. Garcia for Alvin LaCabe and James Davis for Peter Weir.

# CORPORATE DISCLOSURE STATEMENT

Pursuant to Federal Rule of Appellate Procedure 26.1, *amici* hereby certify that they have no parent corporations, nor do any publicly held corporations own 10% or more of their stock.

/s/ Mikolaj T. Tempski
Mikolaj T. Tempski
Counsel for *Amici Curiae*
Dated: June 13, 2011

# TABLE OF CONTENTS

TABLE OF AUTHORITIES ............................................................. iii

INTERESTS OF AMICUS CURIAE ................................................. 1

CONSENT TO FILE .......................................................................... 2

SUMMARY OF ARGUMENT ........................................................... 2

ARGUMENT .................................................................................... 4

   I.   THE TRIAL COURT ERRED IN ITS REASONING FOR SELECTING INTERMEDIATE REVIEW FOR THIS FUNDAMENTAL SECOND AMENDMENT CLAIM. ...................................................................... 4

      A.   Rather Than Concealed Carry, The Combined Regulations Challenged Implicate the Broader Right to Carry Firearms in Public. .................................. 4

      B.   The Combined Regulations Affect a Broad Class of People .................... 5

      C.   The Public Carrying of Firearms for Self-Defense Is Protected As Part of the "Core" Second Amendment Right. ............................................... 6

   II.  VARIOUS METHODS OF REVIEW ARE AVAILABLE TO EXAMINE A SECOND AMENDMENT CLAIM. .................................................. 10

      A.   Means-Ends Standards of Review Do Not Resolve All Second Amendment Questions. ..................................................................... 11

      B.   The Second Amendment Rights of Law-Abiding, Responsible Individuals Are Subject to Strict Scrutiny Review. ........................................ 15

   III. THE TRIAL COURT IMPROPERLY APPLIED A RATIONAL BASIS TEST AND CALLED IT INTERMEDIATE SCRUTINY ................................ 18

CONCLUSION .............................................................................. 21

CERTIFICATE OF COMPLIANCE ................................................. 22

CERTIFICATE OF DIGITAL SUBMISSION ................................... 23

CERTIFICATE OF SERVICE ......................................................... 24

# TABLE OF AUTHORITIES

## Cases

*Andrews v. State*, 50 Tenn. 165 (1871) ................................................................9, 10

*Ashcroft v. ACLU*, 542 U.S. 656 (2004) ...............................................................16

*Barker v. Wingo,* 407 U.S. 514 (1972) ..................................................................19

Cent. Hudson Gas & Elec. Corp. v. Public Serv. Comm'n, 447 U.S. 557 (1980) ..17

*Citizens United v. FEC*, 130 S. Ct. 876 (2010) .....................................................16

*City of Cleburne v. Cleburne Living Ctr.*, 473 U.S. 432 (1985)............................18

*City of Las Vegas v. Moberg*, 82 N.M. 626, 485 P.2d 737 (N.M. Ct. App. 1971)....9

Clark v. Jeter, 486 U.S. 456 (1988) .......................................................................16

*District of Columbia v. Heller*, 128 S. Ct. 2783 (2008)6, 7, 8, 10, 11, 12, 13, 14, 19, 20

*Hudson v. Michigan,* 547 U.S. 586 (2006) .............................................................19

*In re Brickey*, 8 Idaho 597, 70 P. 609 (1902).........................................................9

*Kellogg v. City of Gary*, 562 N.E.2d 685 (Ind. 1990)..............................................9

*Mapp v. Ohio,* 367 U.S. 643 (1961).......................................................................19

*McDonald v. City of Chicago*, 130 S. Ct. 3020 (2010) ............................... 7, 15, 19

*Miranda v. Arizona,* 384 U.S. 436 (1966) .............................................................19

*Muscarello v. United States*, 524 U.S. 125 (1998) ..................................................8

*Nunn v. State,* 1 Ga. 243, 251 (1846)................................................................9, 10

*Parker v. District of Columbia,* 478 F.3d 370 (D.C. Cir. 2007)...................... 13, 15

*Peruta v. County of San Diego*, 758 F.Supp.2d 1106 (S.D. Cal. Dec. 10, 2010)....10

*Plyler v. Doe*, 457 U.S. 202 (1982)..........................................................................18

*Richards v. County of Yolo*, 2011 WL 1885641 at 3 (E.D. Cal. May 13, 2011).....10

*Robertson v. Baldwin*, 165 U.S. 275 (1897) .............................................................9

*Romer v. Evans*, 517 U.S. 620 (1996) ....................................................................18

*State ex rel. City of Princeton v. Buckner*, 180 W. Va. 457, 377 S.E.2d 139 (1988)9

*State v. Chandler*, 5 La. Ann. 489, 490 (1850)......................................................10

*State v. Delgado*, 298 Or. 395, 692 P.2d 610 (Or. 1984) .........................................9

*State v. Reid*, 1 Ala. 612, 616-17 (1840)................................................................10

*State v. Rosenthal,* 75 Vt. 295, 55 A. 610 (1903) .....................................................9

*U.S. v. Reese*, 627 F.3d 792 (10th Cir. 2010) .................................................. 16, 17

*United States v. Carlone Products Co,*, 304 U.S. 144 (1938) ................................20

*United States v. Chester*, 628 F.3d 673 (4th Cir. 2010).......................... 7, 15, 17, 20

*United States v. Engstrum*, 609 F. Supp. 2d 1227 (D. Utah 2009).........................16

*United States v. Everist*, 368 F.3d 517 (5th Cir. 2004)...........................................20

*United States v. Marzzarella*, 614 F.3d 85 (3d Cir. 2010)............................... 15, 16

*United States v. Miller*, 307 U.S. 174 (1939) ....................................................7, 14

*United States v. Skoien*, 614 F.3d 638 (7th Cir. 2010) ................................. 7, 17, 20

United States v. Williams, 616 F.3d 685 (7th Cir. 2010) ........................................17

United States v. Yancey, 621 F.3d 681 (7th Cir. 2010).............................................17

*Ward v. Rock Against Racism*, 491 U.S. 781 (1989)...............................................15

**Statutes**

C.R.S. § 18-12-201 ...........................................................................................5

Denver Code § 38-117 ......................................................................................5

**Other Authorities**

BLACK'S LAW DICTIONARY 214 (6th Ed. 1998).............................................8

# INTERESTS OF *AMICUS CURIAE*[1]

The Second Amendment Foundation, Inc. ("SAF") is a national non-profit educational foundation that seeks to preserve the effectiveness of the Second Amendment through educational and legal action programs.

Buckeye Firearms Foundation (Ohio), Citizens' Rights Action League (Rhode Island), Commonwealth Second Amendment (Massachusets), Connecticut Citizens Defense League, Calguns Foundation, Inc. (California), Gun Owners Civil Rights Alliance (Minnesota), Hawaii Defense Foundation, Illinois Carry, Illinois State Rifle Association, Maine Open Carry Association, Maryland Shall Issue, Oregon Firearms Educational Foundation, Wisconsin Carry, Inc., SCOPE, Inc. (New York), Stillwater Firearms Association (Nevada), Virginia Citizens Defense League, Inc. and West Virginia Citizens Defense League, Inc. are state-focused non-profit organizations dedicated to preserving, defending and promoting firearms rights.  Each organization listed *supra* is from a state whose residents are barred from exercising their right to carry firearms in public while visiting Denver.

Together, *amici* represent hundreds of thousands of members from the twenty states[2], and the District of Columbia, whose residents are prohibited from

---

[1] No party's counsel authored this brief in whole or in part. No party, party's counsel, or any other person other than amici, their members, and counsel, contributed money intended to fund preparation and submission of this brief.

lawfully carrying firearms in Denver. The trial court's decision in this case impacts *amici*'s organizational interests, as well as the interests of their members and supporters who enjoy exercising their right to keep and bears arms. *Amici,* and their members and supporters, have a substantial interest in ensuring that all people are able to exercise their firearm rights without infringement by unconstitutional regulations. *Amici* have participated in numerous firearm rights cases throughout the nation and have substantial expertise in the field of Second Amendment rights that would aid the Court.

## CONSENT TO FILE

*Amici* were given consent to file by Appellants, Appellee Davis and Intervenor Suthers, but consent was refused by Appellee Garcia. As a result, this brief is filed contemporaneously with a motion for leave to file.

## SUMMARY OF ARGUMENT

The court below erred in its interpretation of the protections offered by the Second Amendment, its selection of a standard of review and its application of the standard it chose.

---

[2] California, Connecticut, Hawaii, Illinois, Maine, Maryland, Massachusetts, Minnesota, Nevada, New Jersey, New York, Ohio, Oregon, Rhode Island, South Carolina, Vermont, Virginia, Washington, West Virginia and Wisconsin.

In selecting a standard of review, the trial court based its decision on a number of factors that led to the wrong conclusion. The court erroneously spent much of its effort discussing concealed carry of firearms, incorrectly assumed that the regulations in question burden only a narrow class of people and implied that the right to carry a firearm was not part of the "core" Second Amendment right and therefore deserved less protection. *Amici* aim to identify these errors so they may be corrected.

As with cases involving other constitutional provisions, Second Amendment cases are not universally resolved by application of a means-ends standard of review. While such standards of review are helpful in some cases, they are a poor fit in others. The key is to first identify the nature of the restriction imposed by the challenged law. Where the challenged law so deeply infringes on the right that it can fairly be described as contradicting a constitutional guarantee, as in this case, no analysis is required to strike down the enactment.

Where the law prohibits an arm, the question posed is whether the arm at issue is constitutionally-protected under the "common use" test. If licensing standards are at issue, typical prior restraint doctrines are most relevant (e.g., objective, narrowly-defined standards must prevail, not unfettered discretion). In other cases, arms restrictions are analyzed under either a time, place, or manner analysis based on First Amendment jurisprudence, or upon the application of a

heightened level of scrutiny. Multiple recent court decisions have applied First Amendment standards to Second Amendment cases.

Should this Court find more merit in a means-end scrutiny framework, the appropriate standard of review in this case is strict scrutiny. Lower levels of review are inapplicable in cases involving fundamental rights.

The trial court's erroneous application of intermediate scrutiny review to the regulations at hand was improperly executed and effectively was an application of rational basis review. The court failed to question at all the validity of the reason given in defense of the regulations ("public safety") and only demanded a "reasonable relationship" between the regulation and its aim instead of the required substantial relationship.

The combined regulations and their effect on Appellant-Plaintiff Peterson cannot survive the rigors of strict or even intermediate scrutiny.

**ARGUMENT**

**I.    THE TRIAL COURT ERRED IN ITS REASONING FOR SELECTING INTERMEDIATE REVIEW FOR THIS FUNDAMENTAL SECOND AMENDMENT CLAIM.**

   A. Rather Than Concealed Carry, The Combined Regulations Challenged Implicate the Broader Right to Carry Firearms in Public.

Throughout the order currently being appealed, the court below erroneously focused on concealed carry. *See generally* Applt. Append. p. 211-28.  Because this distinction is extremely important to the constitutional analysis that follows, it is important to clarify this now: this case does not concern merely concealed carry, but rather all forms of carry outside the home, business or private car.  The combination of state and county laws in Denver prohibits citizens from carrying firearms in public[3] for self-defense unless they have a Colorado Concealed Handgun License ("CHL").  *See* C.R.S. § 18-12-201 *et seq.* (Requiring a permit for concealed carry); Denver Code § 38-117(b) (prohibiting open carry in Denver).  Rather than a prohibition on one method or manner of carrying a firearm, Plaintiff-Appellant Peterson endures a complete prohibition on the carrying of arms for self-defense while in Denver.[4]  This incorrect focus prevented the court from properly considering the real burden on Peterson.

## B.  The Combined Regulations Affect a Broad Class of People

The trial court described the group affected by this onerous set of regulations as a "narrow class," and used this as one justification for imposing a lower level of scrutiny. Applt. Append. p. 216.  *Amici* concur with the Plaintiff-Appellant's

---

[3] The only exceptions provided in the law are for carry in one's dwelling, business or private vehicle.  Denver Code § 38-117(f)(2).

[4] Peterson is not covered by any of the exceptions listed above in footnote 2. Appllt. Append., pp. 63-64, 112-113.

position that this is not a proper factor to consider when evaluating an as applied

challenge, or generally for limiting a fundamental right. Further, the contention

that this regulation affects only a small group is just factually untrue. *Amici*

represent hundreds of thousands of members from twenty states and the District of

Columbia, many of whom travel to Denver for business or pleasure. Those

members are denied their Second Amendment rights by Defendant-Appellees

solely because of where they permanently reside. The population of these states

makes up 48.4% of the population of the United States according the 2010 Census.

Were the breadth of the affected class an acceptable factor to consider in this case,

the broad group affected would only support the arguments for applying stronger

scrutiny.

>   C. The Public Carrying of Firearms for Self-Defense Is Protected As Part of
>      the "Core" Second Amendment Right.

The trial court erred in finding that the "core" Second Amendment right

protects only the right to keep a firearm in the home for self-defense. Applt.

Append. p. 216. The right to carry is recognized as existing outside the home on

hunting, recreational and self-defense rationales. [5]

---

[5] *Heller* observed that "Americans valued the ancient right [to keep and bear arms]
. . . for self-defense and hunting." *District of Columbia v. Heller*, 128 S. Ct. 2783,
2801 (2008) (emphasis added). "The settlers' dependence on game for food and
economic livelihood, moreover, undoubtedly undergirded . . . state constitutional

While the Constitutional right to keep and bear arms applies "*most notably for self-defense within the home,*" *McDonald v. City of Chicago*, 130 S. Ct. 3020, 3044 (2010) (plurality opinion) (emphasis added), "where the need for defense of self, family, and property is most acute," *District of Columbia v. Heller*, 128 S. Ct. 2783, 2717 (2008), it does not apply exclusively so. "[T]he Second Amendment creates [sic] individual rights, *one of which* is keeping operable handguns at home for self-defense. What other entitlements the Second Amendment creates, and what regulations legislatures may establish, were left open [in *Heller*]." *United States v. Skoien*, 614 F.3d 638, 640 (7th Cir. 2010) (en banc) (emphasis added). "[T]he core right identified in Heller [is] the right of a law-abiding, responsible citizen to possess *and carry* a weapon for self-defense." *United States v. Chester*, 628 F.3d 673, 683 (4th Cir. 2010) (emphasis removed and added).

---

guarantees [of the right to arms]." *McDonald v. City of Chicago*, 130 S. Ct. 3020, 3042 n.27 (2010). Hunting does not occur inside the home. And even the *Heller* dissenters recognized the majority to have secured a right to arms for "self-defense, recreation, and other lawful purposes." *Heller*, 128 S. Ct. at 2845 n.38 (Stevens, J., dissenting) (emphasis added); id. at 2869 (Breyer, J., dissenting). Recreational firearms use typically occurs outside the home. Further, The Second Amendment's application outside the home dates back to *United States v. Miller*, 307 U.S. 174 (1939), which remanded for further proceedings the question of whether a sawed-off shotgun qualified as a constitutionally- protected arm. The shotgun came within federal purview because it had allegedly been transported from Claremore, Oklahoma to Siloam Springs, Arkansas, id. at 175— obviously outside Miller's home, yet potentially within the Second Amendment's protection.

The Supreme Court has confirmed that "keep and bear," U.S. Const. amend.

II, refers to two distinct concepts, rejecting the argument that "keep and bear arms"

was a unitary concept referring only to a right to possess weapons in the context of

military duty. "At the time of the founding, as now, to 'bear' meant to 'carry.'"

*Heller*, 128 S. Ct. at 2793 (citations omitted). To "bear arms," as used in the

Second Amendment, is to "wear, bear, or carry . . . upon the person or in the

clothing or in a pocket, for the purpose . . . of being armed and ready for offensive

or defensive action in a case of conflict with another person." *Heller*, 128 S. Ct. at

2793 (quoting *Muscarello v. United States*, 524 U.S. 125, 143 (1998) (Ginsburg, J.,

dissenting)); BLACK'S LAW DICTIONARY 214 (6th Ed. 1998)); see also *Heller*,

128 S. Ct. at 2804 ("the Second Amendment right, protecting only individuals'

liberty to keep and carry arms . . ."), at 2817 ("the right to keep and carry arms")

(emphasis added). "[B]ear arms means . . . simply the carrying of arms . . ." *Heller*,

128 S. Ct. at 2796.

Having defined the Second Amendment's language as including a right to

"carry" guns for self-defense, the Supreme Court helpfully noted several

exceptions that prove the rule. Explaining that this right is "not unlimited," in that

there is no right to "carry any weapon whatsoever in any manner whatsoever and

for whatever purpose," *Heller*, 128 S. Ct. at 2816 (citations omitted), the Court

confirmed that there is a right to carry at least some weapons, in some manner, for some purpose.

In upholding the right to carry a handgun under the Second Amendment, *Heller* broke no new ground. *See e.g., Nunn v. State,* 1 Ga. 243, 251 (1846); *In re Brickey*, 8 Idaho 597, 70 P. 609 (1902) (Second Amendment right to carry handgun); *Kellogg v. City of Gary*, 562 N.E.2d 685 (Ind. 1990); *State ex rel. City of Princeton v. Buckner*, 180 W. Va. 457, 377 S.E.2d 139 (1988); *City of Las Vegas v. Moberg*, 82 N.M. 626, 485 P.2d 737 (N.M. Ct. App. 1971); *State v. Rosenthal,* 75 Vt. 295, 55 A. 610 (1903) (striking down ban on concealed carry); *Andrews v. State*, 50 Tenn. 165 (1871); *see also State v. Delgado*, 298 Or. 395, 692 P.2d 610 (Or. 1984) (right to carry a switchblade knife).

The trial court here focused on concealed carry and found, perhaps correctly *if that had been the question before it*, that some regulation of concealed carry survives.  However, the right to bear arms is not abrogated by recognition of that some subparts of it may be regulated. To the contrary, precedent approving of the government's ability to regulate the manner of carrying of handguns confirms the general rule to which it establishes exceptions. Traditionally, "the right of the people to keep and bear arms (Article 2) is not infringed by laws prohibiting the carrying of concealed weapons . . . " *Robertson v. Baldwin*, 165 U.S. 275, 281-82 (1897) (emphasis added).  *Heller* discussed, with approval, four state supreme

court opinions that referenced this conditional rule. See Heller, 128 S. Ct. at 2818 (discussing *Nunn*, 1 Ga. 243; *Andrews*, 50 Tenn. 165; and *State v. Reid*, 1 Ala. 612, 616-17 (1840)) and 128 S. Ct. at 2809 (citing *State v. Chandler*, 5 La. Ann. 489, 490 (1850)).

More recently, two United States District Courts in California upheld California's concealed-handgun law on the rationale that the law did not raise constitutional concerns because California law still permitted unlicensed citizens to carry handguns in plain view. *See Peruta v. County of San Diego*, 758 F.Supp.2d 1106, 1113-14 (S.D. Cal. Dec. 10, 2010); *Richards v. County of Yolo*, 2011 WL 1885641 at 3 (E.D. Cal. May 13, 2011).   The *Peruta* court accepted that "not *all* concealed weapons bans are presumptively lawful," *Peruta v. County of San Diego*, 758 F.Supp.2d at 1114 (emphasis in source), and the *Richards* court concurred, allowing the California licensing scheme to survive only because "the policy does not create a total ban on carrying a firearm." *Richards v. County of Yolo*, 2011 WL 1885641 at 3.

The right of law-abiding citizens to carry a firearm outside the home is part of the "core" Second Amendment right and the combination of laws being challenged herein unconstitutionally abrogates that right.

## II.   VARIOUS METHODS OF REVIEW ARE AVAILABLE TO EXAMINE A SECOND AMENDMENT CLAIM.

A. Means-Ends Standards of Review Do Not Resolve All Second
   Amendment Questions.

Many Second Amendment cases may be resolved without employing a

means-ends standard of review. The Supreme Court declined to adopt any "level of

scrutiny" in striking down two laws—a handgun ban and a functional firearm

ban—and directing the application of a third law—a carry-permit requirement,

under the Second Amendment. *District of Columbia v. Heller*, 128 S. Ct. 2783

(2010). As discussed *infra*, Washington's functional firearm ban and home-carry

permit scheme simply conflicted with the Second Amendment's core. The city's

handgun ban failed a distinct "common use test" for protected arms. And

separately, the Court advised that the right to carry guns included an inherent time,

place and manner test.

These approaches warrant study. Before addressing which level of scrutiny

to apply, this Court should first determine whether a level of scrutiny is required at

all. And if the ordinance must be analyzed with reference to a standard of review,

this Court should first clarify why such an approach, as opposed to the other

approaches demonstrated by Heller, is to be followed.

1. Resolving Cases by Defining the Right's Core

With respect to Washington's complete ban on the possession of functional

firearms within the home, the Court simply offered that the ban "makes it

impossible for citizens to use [guns] for the core lawful purpose of self-defense and is hence unconstitutional." *Heller*, 128 S. Ct. at 2818. That law stood at the opposite end of the spectrum from "longstanding prohibitions" that "the full scope of the Second Amendment" might not reach. *Id*. at 2816. The Court made clear that historical analysis guided its understanding of what would lie at the right's core, and what conduct might be outside the scope of its protection. Laws conflicting with the Second Amendment right's core protections could not survive. Laws reflecting historical practices would be presumptively valid.

And if history would serve as a guide as to what might be within the Second Amendment (e.g., the use of guns for self-defense) and what might be without it ("longstanding prohibitions"), the Court decidedly rejected one source of guidance: "We know of no other enumerated constitutional right whose core protection has been subjected to a freestanding 'interest-balancing' approach." *Id.* at 2821 (emphasis added).

This same process, identifying whether a regulation conflicts with a "core protection" of the Amendment without resort to interest- balancing, resolved Heller's challenge to a requirement that he obtain an unavailable permit to move a

handgun inside his home.[6] The D.C. Circuit found the restriction violated the

Second Amendment's core:

> It is sufficient for us to conclude that just as the District may not flatly
> ban the keeping of a handgun in the home, obviously it may not
> prevent it from being moved throughout one's house. Such a
> restriction would negate the lawful use upon which the right was
> premised–i.e, self-defense.

*Parker v. District of Columbia,* 478 F.3d 370, 400 (D.C. Cir. 2007), *aff'd sub nom,*

*Heller.* The Supreme Court affirmed using the same approach, concluding the city

had no discretion to refuse issuance of the permit: "Assuming that Heller is not

disqualified from the exercise of Second Amendment rights, the District must

permit him to register his handgun and must issue him a license to carry it in the

home." Heller, 128 S. Ct. at 2822.

*Amici* urge the court to consider this approach for reviewing the combination

of laws in this case.  As the regulations combine to create a complete prohibition

against Peterson's right to carry a firearm for self-defense in public, they conflict

with the core right that has been outlined above.

## 2.  Arms Prohibitions: The Common-Use Test

*Heller* employed a categorical, non-balancing approach to resolve the

constitutionality of a handgun ban.  First, "arms" as used in the Second

---

[6] Heller did not request a public-carry permit.

Amendment are "anything that a man wears for his defence," including "all firearms." *Heller*, 128 S. Ct. at 2791 (citations omitted). Second, "the sorts of weapons protected [by the Second Amendment are] those 'in common use at the time.'" *Heller*, 128 S. Ct. at 2817 (quoting *United States v. Miller*, 307 U.S. 174, 179 (1939)). "[T]he Second Amendment does not protect those weapons not typically possessed by law-abiding citizens for lawful purposes." *Heller,* 128 S. Ct. at 2815-16.

Using this two-step approach—first, is the object an "arm," second, would it be expected in common use by law-abiding people—the handgun ban was easily resolved with a categorical common-use test, not with a standard of review. *Heller*, 128 S. Ct. at 2818.

### 3. Time, Place, and Manner Restrictions.

As discussed *supra*, the Second Amendment tolerates bans on the concealed carrying of arms so long as open carrying is allowed, and vice-versa. The right to carry has certain inherent categorical limitations: the right is "not unlimited," as there is no right to "carry any weapon whatsoever in any manner whatsoever and for whatever purpose." Heller, 128 S. Ct. at 2816. And "laws forbidding the carrying of firearms in sensitive places" are "presumptively lawful." Id. at 2817 & n.26. In other words, the act of carrying a gun may be subject to a time, place, and

14

manner regime. The D.C. Circuit had reached this conclusion explicitly. *See Parker*, 478 F.3d at 399 (citing *Ward v. Rock Against Racism*, 491 U.S. 781 (1989)).

The availability of time, place and manner review in Second Amendment cases evaluating carry restrictions is confirmed by the decisions of two additional circuits explicitly adopting First Amendment frameworks for Second Amendment analysis. *Chester*, 628 F.3d. at 682 ("we agree with those who advocate looking to the First Amendment as a guide in developing a standard of review for the Second Amendment") (citations omitted); *United States v. Marzzarella*, 614 F.3d 85, 89 n.4 (3d Cir. 2010)(reasoning that the serial number law does not "prohibit[ ] the possession of any class of firearms, [and] it is more accurately characterized as a regulation of the manner in which persons may lawfully exercise their Second Amendment rights.")

B.  The Second Amendment Rights of Law-Abiding, Responsible
     Individuals Are Subject to Strict Scrutiny Review.

To the extent some other, more-specifically appropriate test does not answer Second Amendment questions, the appropriate means-ends standard of review in Second Amendment cases is strict scrutiny. The Second Amendment secures a fundamental right. McDonald, 130 S. Ct. at 3042 (plurality opinion) & 3059 (Thomas, J., concurring). "[C]lassifications affecting fundamental rights are given

15

the most exacting scrutiny." *Clark v. Jeter*, 486 U.S. 456, 461 (1988) (citation

omitted). Under this analysis, the government carries the burden of proving the law

"furthers a compelling interest and is narrowly tailored to achieve that interest,"

*Citizens United v. FEC*, 130 S. Ct. 876, 898 (2010) (citation omitted), a burden that

cannot be met where less restrictive alternatives are available to achieve the same

purpose. *Ashcroft v. ACLU*, 542 U.S. 656, 666 (2004); *see also United States v.*

*Engstrum*, 609 F. Supp. 2d 1227, 1331-32 (D. Utah 2009) (applying strict scrutiny

in Second Amendment analysis).

Appellees and the trial court both erred in asserting that intermediate

scrutiny is the appropriate level of review for most Second Amendment cases. The

third circuit has expressly recognized that different types of gun restrictions would

require the use of different analytic models. *Marzzarella,* 614 F.3d at 96 ("[T]he

right to free speech, an undeniably enumerated fundamental right, is susceptible to

several standards of scrutiny, depending upon the type of law challenged and the

type of speech at issue. We see no reason why the Second Amendment would be

any different.").

At least three appellate courts, including this Court, apply intermediate

scrutiny in Second Amendment cases questioning laws of the type Heller identified

as presumptively lawful. *U.S. v. Reese*, 627 F.3d 792, 802 (10th Cir. 2010); *U.S. v.*

16

*Chester*, 628 F.3d 673, 682 -683 (4th Cir. 2010); *Skoien*, 614 F.3d at 641. But these courts have not reserved for peaceful, law-abiding people a lower level of review than that which is employed for violent felons, drug abusers, and other dangerous individuals arguably covered by a presumptive exception.

To the contrary, this court applied intermediate, rather than strict scrutiny in Second Amendment circumstances only because the statute applied to a class of non-law-abiding "persons who, based on their past behavior, are more likely to engage in domestic violence." *Reese*, 627 F.3d at 802. The Fourth Circuit also selected intermediate scrutiny because it viewed the Second Amendment's core as reaching "*law-abiding*, responsible citizen[s]," Chester, 628 F.3d. at 683 (emphasis original). The opinion clearly indicates that strict scrutiny must apply in Second Amendment cases involving ordinary individuals. And the Seventh Circuit has suggested overbreadth is a possible alternative mode of analysis. United States v. Williams, 616 F.3d 685, 693 (7th Cir. 2010); cf. United States v. Yancey, 621 F.3d 681, 685 (7th Cir. 2010)("felon-in-possession laws could be criticized as 'wildly overinclusive'"). These determinations are consistent with the understanding that intermediate scrutiny applies to an enumerated right only under circumstances where the right's exercise is "of less constitutional moment." Cent. Hudson Gas & Elec. Corp. v. Public Serv. Comm'n, 447 U.S. 557, 563 n.5 (1980).

Indeed, intermediate scrutiny is not a reduced form of strict scrutiny; it is an enhanced version of rational basis review. "'[I]ntermediate' scrutiny permits us to evaluate the rationality of the legislative judgment . . . we employ this standard to aid us in determining the rationality of the legislative choice." *Plyler v. Doe*, 457 U.S. 202, 217 n.16 (1982). This aid is invoked in "quasi-suspect" cases, *City of Cleburne v. Cleburne Living Ctr.*, 473 U.S. 432, 442 (1985), where the government's classifications do not relate to enumerated rights or suspect classes, and would thus trigger only un-enhanced rational basis review in the absence of intermediate scrutiny's boost. *Romer v. Evans*, 517 U.S. 620, 631 (1996).

## III.   THE TRIAL COURT IMPROPERLY APPLIED A RATIONAL BASIS TEST AND CALLED IT INTERMEDIATE SCRUTINY

The trial court initially stated that it was applying intermediate scrutiny by requiring "a substantial reason" for the restrictive scheme and "a substantial relationship between the restriction and the interest it seeks to promote." Applt. Append. p. 220. When analyzing the provided reasoning, the examination changed and the court simply accepted the proffered "public safety" reasoning and stated that the regulation need only have a "reasonable relationship" with its aim. *Id*. at 220-22.

Generalized "public safety" concerns cannot be the proper basis for regulating an enumerated constitutional right. The Supreme Court, in *McDonald*,

18

expressed this quite clearly when it explained that while many rights "ha[ve] controversial public safety implications" it had never ignored "a provision of the Bill of Rights… on the ground that the right at issue has disputed public safety implications." *McDonald,* 130 S.Ct. at 3045.  The *McDonald* Court cited numerous occasions where other constitutional rights impact "public safety," but most nonetheless be protected. *See Hudson v. Michigan,* 547 U.S. 586, 591 (2006) ("The exclusionary rule generates 'substantial social costs,' which sometimes include setting the guilty free and the dangerous at large")(citation omitted); *Barker v. Wingo,* 407 U.S. 514, 522 (1972) (reflecting on the serious consequences of dismissal for a speedy trial violation, which means "a defendant who may be guilty of a serious crime will go free"); *Miranda v. Arizona,* 384 U.S. 436, 517 (1966) (Harlan, J., dissenting); *id.,* at 542, (White, J., dissenting) (objecting that the Court's rule "[i]n some unknown number of cases ... will return a killer, a rapist or other criminal to the streets ... to repeat his crime"); *Mapp v. Ohio,* 367 U.S. 643, 659 (1961). *McDonald,* 130 S.Ct. at 3045.

The lack of any questioning of the Appellees' reason for the regulation combined with only requiring a "reasonable relationship" between the regulation and its aim make this equivalent to rational basis review.  The low bar set by rational basis review would 'presume' that state statutes implicating the right to bear arms are valid until proven otherwise. *Contra Heller*, 128 S. Ct. at 2818 n.27

19

(questioning presumption of constitutionality "when legislation appears on its face
to be within a specific prohibition of the Constitution, such as those of the first ten
amendments") (quoting *U.S. v. Carlone Products Co,*, 304 U.S. 144, 152 n.4.
(1938))).

In reality, under no circumstance is rational basis review available. The
Supreme Court has made clear that the rational basis test "could not be used to
evaluate the extent to which a legislature may regulate a specific, enumerated right,
be it the freedom of speech, the guarantee against double jeopardy, the right to
counsel, or the right to keep and bear arms." *Heller*, 128 S. Ct. at 2818 n.27 (citing
*Carolene Products,* 304 U.S. at 152, n. 4). "If a rational basis were enough, the
Second Amendment would not do anything." *Skoien*, 614 F.3d at 641. "[R]ational-
basis review . . . has been rejected by *Heller*." *Chester*, 628 F.3d at 679. "[I]t
remains certain that the federal government may not restrain the freedom to bear
arms based on mere whimsy or convenience." *United States v. Everist*, 368 F.3d
517, 519 n.1 (5th Cir. 2004).

Under the standard applied by the trial court, any law intended to increase
"public safety" would pass muster.  If that is the case for enumerated rights, then
why bother enshrining rights in the Constitution?  The trial court should have

20

required the government must provide more justification for a combination of laws that infringe on the right to bear arms.

## CONCLUSION

For the foregoing reasons, *amici* support the position of the Appellants in this case.

Dated: June 13, 2011                    Respectfully Submitted,


                                        Mikolaj T. Tempski
                                        Second Amendment Foundation, Inc.
                                        12500 NE Tenth Pl
                                        Bellevue, WA 98005
                                        425.454.7012/Fax: 425.451.3959
                                        miko.tempski@saf.org


                                By:    /s/ Mikolaj T. Tempski
                                        Mikolaj T. Tempski

                                        Counsel for *Amici Curiae*

**CERTIFICATE OF COMPLIANCE**


I hereby certify that, according to the word count provided in Microsoft Word 2010, the foregoing brief contains 4,876 words, excluding the parts of the brief excluded by Fed. R. App. P. 32(a)(7)(B)(iii). The text of the brief is in proportional Times New Roman font with 14-point type, and the brief thus complies with the type-volume limitations, typeface requirements and type style requirements of Federal Rule of Appellate Procedure 29(d), 32(a) and 10th Circuit Rule 32(a).


/s/ Mikolaj T. Tempski
Mikolaj T. Tempski
Counsel for *Amici Curiae*
Dated: June 13, 2011

**CERTIFICATE OF DIGITAL SUBMISSION**

There are no required privacy redactions to be made in this brief and every document submitted in PDF format is an exact copy of the hard copy filed with the Clerk.

The digital submission of this brief has been scanned for viruses with Microsoft Security Essentials version 1.105.1849.0, last updated June 13th, 2011, and this submission is free of viruses.

/s/ Mikolaj T. Tempski
Mikolaj T. Tempski
Counsel for *Amici Curiae*
Dated: June 13, 2011

**CERTIFICATE OF SERVICE**

On this, the 13th day of June, 2011, I served the foregoing Amicus Curiae

Brief by electronically filing it with the Court's CM/ECF system, which generated

a Notice of Filing and effects service upon counsel for all parties in the case.

I declare under penalty of perjury that the foregoing is true and correct.

Executed this the 13th day of June, 2011.

/s/ Mikolaj T. Tempski
Mikolaj T. Tempski